2014 IL App (3d) 130137

Opinion filed February 5, 2014

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2014

| | | |
|---|---|---|
| MARK LORENZ, GARY LORENZ and LESLIE LORENZ, | ) ) ) | Appeal from the Circuit Court of the 9th Judicial Circuit, McDonough County, Illinois |
| Plaintiffs, | ) ) | |
| BRIAN DAYTON, Individually and as the Special Administrator of the Estate of Jill D. Dayton, Deceased, and AMANDA DAYTON NEHRING, | ) ) ) ) | |
| Plaintiffs-Appellants, | ) ) | Appeal No. 3-13-0137 Circuit No. 06-L-9 |
| v. | ) ) ) | |
| THOMAS PLEDGE and the McDONOUGH COUNTY SHERIFF'S DEPARTMENT, | ) ) ) | Honorable Richard H. Gambrell, |
| Defendants-Appellees. | ) | Judge, Presiding |

JUSTICE O'BRIEN delivered the judgment of the court, with opinion.
Justice Carter concurred in the judgment and opinion.
Justice Schmidt dissented, with opinion.

**OPINION**

¶ 1     Plaintiffs Brian Dayton, individually and as special administrator of the estate of Jill Dayton, deceased, Amanda Dayton Nehring, and others not involved in this appeal, filed personal injury and wrongful death actions against defendants Thomas Pledge and the

McDonough County sheriff's department, for damages they sustained following a car accident between the Daytons' minivan and a sheriff's squad car. Following a trial, the jury entered a verdict in favor of Pledge. The Daytons appealed. We reverse and remand for a new trial.

¶ 2 FACTS

¶ 3 On September 3, 2004, at approximately 11:30 p.m., defendant McDonough County sheriff's department received a call regarding an erratically driven sport utility vehicle (SUV). Defendant Deputy Thomas Pledge, who responded to the call, located and observed the SUV. His squad video activated, and after seeing the SUV swerve several times, Pledge effectuated a traffic stop. As Pledge approached the stopped SUV, it sped away, and he pursued the vehicle. The SUV and Pledge proceeded southbound on Route 67, heading into Macomb. Pledge's vehicle reached speeds as high as 110 miles per hour and was traveling at 100 miles per hour approximately four seconds before he entered the intersection of Route 67 and University Drive. The SUV turned off its headlights as it neared the intersection.

¶ 4 At the same time the SUV and Pledge were speeding toward the intersection, a minivan traveling northbound on Route 67 and occupied by 16-year-old Amanda Dayton, the driver; her mother, Jill Dayton, in the passenger seat; and their friend, Mark Lorenz, in the backseat, entered the intersection's center turn lane to proceed left onto University Drive. The SUV passed through the intersection, and as Amanda began the left turn, the squad entered the intersection and struck the minivan on the passenger side. Pledge, Amanda and Lorenz were injured, and Jill was killed in the accident.

¶ 5 Plaintiffs Mark Lorenz, Gary Lorenz, Leslie Lorenz (collectively Lorenzes), Brian Dayton, individually and as special administrator of the estate of Jill Dayton, and Amanda

2

Dayton Nehring (collectively Daytons) sought to recover damages for their injuries from Pledge, individually and as a McDonough County deputy sheriff, and the McDonough County sheriff's department. The Lorenzes are not part of this appeal. The fourth amended complaint asserted wrongful death and bodily injury against Pledge, the sheriff's department and McDonough County. McDonough County was later dismissed from the case. The complaint alleged that Pledge acted both negligently, and willfully and wantonly, and violated provisions of several statutes and the sheriff's department pursuit policy.

¶ 6    Both parties filed motions *in limine*. The Daytons sought to preclude a videotape prepared by a defense expert witness, Michael O'Hern.  The video portrays a visibility or line-of-sight study undertaken by O'Hern and designed to give an indication of the line of sight down Route 67 that Amanda would have had from the left-turn lane.  The Daytons argued that the video was an enactment of the crash and its probative value was outweighed by its prejudicial effect.  Following a hearing, the trial court denied the motion *in limine*.

¶ 7    A jury trial ensued.  Testifying for the Daytons were Pledge, expert witness Robert Johnson, Amanda Dayton Nehring, and Brian Dayton. Evidence depositions of an occurrence witness and a medical doctor were read into evidence. Michael O'Hern testified as an expert witness for the defense.  He created the line-of-sight video in response to an early claim by the Daytons that there were trees blocking Amanda's visibility. He undertook the experiment to determine whether there were any structures impeding Amanda's view; whether she could see Pledge's squad car; and whether it was necessary for her to yield to oncoming traffic.  O'Hern reiterated a number of times that the video was not a reconstruction of the accident and explained the various differences between the conditions of the actual crash and the line-of-sight

3

experiment, including speed, lane position, static position from the left lane, normal driving conditions, and an illuminated SUV. The conclusion O'Hern reached from the experiment was that Amanda had a "clear line of sight of both southbound lanes of traffic" for one-half mile as observed from the left-turn lane. In addition to the video, O'Hern also based his opinion on his experience and training.

¶ 8　The Daytons timely objected to use of the video, arguing it was cumulative, inaccurate, and confusing, and that its probative value was outweighed by its prejudicial effect. The trial court overruled the objection and gave a limiting instruction to the jury as follows:

> "The witness has explained why the video was produced and you should consider it only for purposes of the consideration that the witness took of the information that's contained therein. You can consider the material for that purpose in deciding what weight, if any, you give the opinions that have been testified to by the witness."

¶ 9　Based on O'Hern's review of the squad car video, he concluded that Amanda's line of sight was blocked for one second by the passing SUV but the squad's emergency lights were still visible, and that Amanda could see the approaching squad for 13 to 15 seconds before the impact. He further opined that Pledge was traveling at 86 miles per hour entering the intersection, slowed to 73.9 miles per hour prior to impact, and to 70 miles per hour at impact. O'Hern stated that Amanda "would have a duty to yield and stop and not engage in that left turn maneuver in front of the vehicle." He opined that Amanda had a duty to yield to oncoming traffic in general, and to emergency vehicles in particular, when turning left. In O'Hern's professional

4

opinion, Amanda's failure to yield was the cause of the accident and Pledge operated with due regard for the public's safety.

¶ 10 Closing arguments took place. Counsel for the Daytons argued that Amanda's vehicle was only visible for five seconds before the collision as indicated in the squad video. The defense objected, to which the trial court responded, as follows.

> "The objection is that you have misstated the fact. That is, I believe that there was testimony or some sort of evidence that there was a period of five seconds within which the squad car would have been viewed, and my recollection of the evidence is that there was no such testimony from any of the occupants of the [mini]van. There was no testimony from the evidence deposition of the occurrence witness, and there was no testimony of five seconds. The only testimony that I heard was the opinion witness of the defense."

¶ 11 During deliberations the jury asked to see the squad car video, along with other evidence. The video was replayed for the jury. The jury returned a verdict for Pledge and against the Daytons. The Daytons filed a posttrial motion, maintaining that the O'Hern video was improperly admitted; O'Hern improperly gave an opinion on Amanda's duty; they were prejudiced by the defense's closing argument; and the trial court failed to properly instruct the jury. The Daytons' motion was heard and denied. They appealed.

¶ 12                                     ANALYSIS

5

¶ 13   The Daytons raise four issues on appeal.  They challenge the trial court's rulings on the admission of the defense's line-of-sight video; the limiting instruction concerning the video; the limitations on their closing argument; and the defense expert's testimony regarding Amanda's duty.

¶ 14   The first issue is whether the trial court erred in admitting the defense video.  The Daytons argue that the line-of-sight video submitted by the defense was improperly admitted. They maintain the conditions shown in the video were not substantially similar to the conditions of the accident, and the video was inaccurate, misleading, and confusing, unfairly biased to the defense theory, and an informal accident reconstruction.

¶ 15   The general guidelines for the admission of experiments are found in the Illinois Rules of Evidence 401 and 402 (Ill. R. Evid. 401, 402 (eff. Jan. 1, 2011)) regarding relevant and irrelevant evidence.  Relevant evidence is any evidence that has a tendency to make the existence of a fact of consequence in the case more probable or less probable than it would be without the evidence. *Voykin v. Estate of DeBoer*, 192 Ill. 2d 49, 57 (2000); *People v. Monroe*, 66 Ill. 2d 317, 321-22 (1977).  In addition, a court may exercise its discretion and exclude evidence, even if it is relevant, if the danger of unfair prejudice substantially outweighs its probative value.  Ill. R. Evid. 403 (eff. Jan. 1, 2011); *People v. Hanson*, 238 Ill. 2d 74, 102 (2010).  Distinguishing between an experiment (substantive evidence) and the use of demonstrative evidence (explanatory evidence) is sometimes difficult and confusing.  See *People v. Hayes*, 353 Ill. App. 3d 355, 360 (2004); *Foster v. Devilbiss Co.*, 174 Ill. App. 3d 359, 365 (1988); Michael H. Graham, Graham's Handbook of Illinois Evidence § 401.11, at 190 (10th ed. 2010).

¶ 16    The foundational requirements for the admission of experiments or tests is "whether the 'essential conditions' or 'essential elements' of the experiment are substantially similar" to the conditions at the time of the accident. *Brennan v. Wisconsin Central Ltd.*, 227 Ill. App. 3d 1070, 1087 (1992). If an experiment is presented as a reenactment, the proponent must establish the test was performed under conditions closely duplicating the accident. *Brennan*, 227 Ill. App. 3d at 1087. When an experiment is designed to test only one aspect or principle related to the cause or result of the accident at issue, the exact conditions of the accident do not need to be replicated but that particular aspect or principle must be substantially similar. *Galindo v. Riddell, Inc.*, 107 Ill. App. 3d 139, 144 (1982). This court reviews evidentiary errors for an abuse of discretion. *Bosco v. Janowitz*, 388 Ill. App. 3d 450, 463 (2009). The admission of demonstrative evidence that may confuse or mislead the jury, or prejudice a party, constitutes an abuse of the trial court's discretion. *Hernandez v. Schittek*, 305 Ill. App. 3d 925, 932 (1999). Where a trial court abuses its discretion in admitting evidence, a reviewing court should grant a new trial only where "the error was substantially prejudicial and affected the outcome of the case." *Taluzek v. Illinois Central Gulf R.R. Co.*, 255 Ill. App. 3d 72, 83 (1993).

¶ 17    It is proper to exclude experiments to determine the extent of visibility prior to the accident in question if the conditions are not substantially similar. See *Kent v. Knox Motor Service, Inc.*, 95 Ill. App. 3d 223, 226 (1981) (where type of vehicle, light condition, and conditions of highway in line-of-sight test were not the same, nor substantially the same, as during the accident, the trial court's refusal to admit experiment to determine extent of driver's visibility was not an abuse of discretion); *Amstar Corp. v. Aurora Fast Freight*, 141 Ill. App. 3d 705, 709 (1986) (proper to exclude videotape where the difference in vantage point from position

of video camera and position of driver was significant and misleading); *French v. City of Springfield*, 65 Ill. 2d 74, 81-82 (1976) (city was prejudiced by improper admission of motion picture, which depicted area where accident occurred and preconditioned the minds of the jurors to accept the plaintiff's theory of the case). This court recently addressed the same issue presented here in *Johnson v. Bailey*, 2012 IL App (3d) 110016, and rejected arguments similar to those presented by Pledge. In *Johnson*, the trial court improperly admitted photographs that the defense argued portrayed the layout of the gas station parking where the plaintiff was injured in a collision with the defendant. *Johnson*, 2012 IL App (3d) 110016, ¶ 15. One vehicle shown in the photo accurately represented the position of the defendant's vehicle but the second vehicle in the photo was not in a location substantially similar to the location of the plaintiff's vehicle when the accident occurred. *Johnson*, 2012 IL App (3d) 110016, ¶ 15. In addition to depicting the lot's layout and traffic flow, the photos also showed an inaccurate location of the plaintiff's vehicle, which we considered could mislead the jury. *Johnson*, 2012 IL App (3d) 110016, ¶ 15. Because the photographs did not accurately portray the location of plaintiff's vehicle, we found that the foundation was incomplete and the plaintiff was prejudiced by their improper admission. *Johnson*, 2012 IL App (3d) 110016, ¶ 16.

¶ 18　　The same circumstances are present in the instant case. The video does not meet the test for admissibility of experimental evidence. For the video to satisfy the foundational requirements, the defense needed to establish that the essential conditions of the line-of-sight experiment were substantially similar to those that existed when the accident occurred. It is undisputed that the essential conditions regarding line of sight were not substantially similar when the video was created. The pursuit involved speeds in excess of 100 miles per hour, while

8

the SUV and squad car in the video were driving at 40 miles per hour. The vehicles in the experiment were in a different lane than the SUV and Pledge's vehicle, and standing traffic is visible in the video that was not present when the accident occurred. The SUV's lights were on in the video, contrary to the pursued SUV, which had turned off its lights during the pursuit. The video was taken from a static position in the left-turn lane, while the evidence at trial suggests Amanda's minivan was consistently moving through the intersection.

¶ 19    Pledge expressly admits the differences exist, but argues that they go to the weight the jury should give the evidence, not to its admissibility. Pledge asserts the jury was informed repeatedly throughout the trial that the line-of-sight experiment was not a re-creation of the accident. We agree with the defense that it repeatedly informed the jury that the video was not a re-creation. Nevertheless, that does not relieve Pledge of the obligation to demonstrate that the essential conditions of the line-of-sight evidence offered by his expert were substantially similar to the conditions as they appeared in Amanda's line of sight at the time of the accident. The various differences, as discussed above, preclude any substantial similarities regarding line-of-sight conditions. Like the defendant in *Johnson*, Pledge cannot establish that the essential conditions regarding Amanda's line of sight were substantially similar to the conditions existing when the video experiment was performed. Because Pledge cannot satisfy the requirements for the admission of demonstrative evidence, we find the video was admitted in error.

¶ 20    We further find that the improper admission prejudiced the Daytons. A critical issue in the case was Amanda's negligence. The effect of the video was to precondition the jury to accept the defense's theory of the accident. Because its essential conditions were not substantially similar to conditions when the accident took place, the video had the potential to

confuse and mislead the jury. The video depicted a different scene than Amanda would have seen when the accident occurred and offered a portrayal of the accident's circumstances favorable to the defense. The prejudicial impact of the video outweighed its probative value and precluded its admission.

¶ 21    We find that the trial court abused its discretion in allowing the video to be admitted into evidence and that the Daytons are entitled to a new trial. Although the resolution of the first issue is dispositive, we briefly address the other issues the Daytons raise on appeal to the extent they are likely to arise in the new trial.

¶ 22    The Daytons challenge the limiting instruction provided by the trial court regarding the defense video, asserting it was confusing, prejudicial and improper. We agree. The Illinois Pattern Jury Instructions provide the following instruction on evidence admitted for a limited purpose:

> "The following evidence concerning [(describe evidence)] is to be considered by you solely as it relates to [(limited subject matter)]. It should not be considered for any other purpose." Illinois Pattern Jury Instructions, Civil, No. 2.02 (2000) (hereinafter, IPI Civil (2000) No. 2.02).

The trial court instructed the jury as follows:

> "The witness has explained why the video was produced and you should consider it only for purposes of the consideration that the witness took of the information that's contained therein. You can consider the material for that purpose in deciding what weight, if

10

any, you give the opinions that have been testified to by the witness."

¶ 23    The trial court's limiting instruction did not track the language of the applicable pattern jury instruction.  See IPI Civil (2000) No. 2.02.  The trial court must give instructions that fairly and accurately state the law and are clear enough so the jury is not misled.  *Eskew v. Burlington Northern & Santa Fe Ry. Co.*, 2011 IL App (1st) 093450, ¶ 31.  The limiting instruction given by the trial court did not clearly or comprehensively inform the jury that the video's limited purpose related only to line of sight as the basis for the defense expert's opinion.

¶ 24    The Daytons also challenge the trial court's limitation on their closing argument, arguing that the trial court prevented them from offering an inference arising from the squad car video. In closing argument, counsel for the Daytons inferred that the squad video depicts a five-second period when Amanda could see the approaching squad based on when her minivan comes into view on the video. We consider the Daytons' argument to be supported by the evidence presented.  The squad video, admitted as substantive evidence without objection, was viewed by the jury, which was capable of determining the amount of time it thought Amanda had to see the squad car.  The opinion of the defense expert that the squad was visible to Amanda for 13 seconds was based on his viewing of the squad video.  The jury was free to reject his conclusion in favor of its own determination based on what the jurors saw in the squad video, which was equipped with audio and an onscreen timer.  Watching the video and counting the seconds are not beyond the ken of the ordinary juror and not subjects limited to expert testimony.  *Kimble v. Earle M. Jorgenson Co.*, 358 Ill. App. 3d 400, 412-13 (2005). At retrial, the trial court should not limit the Daytons' presentation of this argument, if appropriate.

11

¶ 25　Lastly, the Daytons argue that the trial court improperly allowed the defense expert to testify regarding Amanda's duty and that the testimony misstated Illinois duty law and prejudiced them. We find there was no error in O'Hern's testimony regarding Amanda's duty. It is well settled that an expert may opine on an ultimate fact or issue as long as the other requirements for the expert testimony are met. *Jackson v. Seib*, 372 Ill. App. 3d 1061, 1071 (2007). O'Hern testified that Amanda had a duty to yield to Pledge's emergency vehicle before executing the left turn and that, based on his training, education and experience, the cause of the accident was Amanda's failure to yield. O'Hern's opinion does not impermissibly intrude on the jury's role because the jury was free to reject O'Hern's opinion. *Zavala v. Powermatic, Inc.*, 167 Ill. 2d 542, 545 (1995). In addition, the jury was to determine whether Pledge acted willfully and wantonly, a finding it could make even if Amanda failed to yield.

¶ 26　The dissent claims that we have ignored the arguments of the defendants that the evidentiary rulings of the trial court were either proper or, if made in error, harmless error. Nothing is further from the truth. We carefully considered the defendants' arguments concerning the propriety of the evidentiary rulings before us on appeal and rejected the notion that this trial was fair despite the prejudice to the plaintiff that resulted from the improper admission or barring of certain evidence as outlined above.

¶ 27　For the foregoing reasons, the judgment of the circuit court of McDonough County is reversed and the cause remanded.

¶ 28　Reversed and remanded.

¶ 29　JUSTICE SCHMIDT, dissenting.

¶ 30 It is clear that this case never should have gone to trial and, therefore, any errors in evidentiary rulings are, at best, harmless and not a proper basis for reversal. *Wade v. City of Chicago*, 364 Ill. App. 3d 773, 784-85 (2006). Defendants' motion for summary judgment should have been granted. While those with nothing more important to do can sit and ponder whether Deputy Pledge's decision to follow the fleeing vehicle was negligent, no reasonable person could conclude that his actions constituted willful and wanton conduct. As a matter of law, the deputy's conduct did not constitute willful and wanton misconduct.

¶ 31 Willful and wanton conduct is "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210 (West 2010). Our supreme court has held that "[w]illful and wanton conduct is found where an act was done with actual intention or with a conscious disregard or indifference for the consequences when the known safety of other persons was involved." (Internal quotation marks omitted.) *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 148 Ill. 2d 429, 451 (1992).

¶ 32 The defendants argue that any errors in evidentiary rulings were harmless because the plaintiffs, as a matter of law, failed to prove that Deputy Pledge was guilty of willful and wanton conduct. How does the majority deal with that argument? It ignores it, other than a single sentence: "In addition, the jury was to determine whether Pledge acted willfully and wantonly, a finding it could make even if Amanda failed to yield." *Supra* ¶ 25. The majority ignores all the case law cited by defendants, including cases from this court affirming summary judgment granted in police pursuit cases.

¶ 33    The operative facts in this case are as follows: (1) The driver of the van fled a traffic stop and drove at a high rate of speed at night with no lights. (2) Deputy Pledge made the snap decision that it was best to follow this vehicle rather than let the vehicle continue to drive at a high speed with no lights. (3) The pursuit in this case was not the basis for the erratic driving by the suspect vehicle. It was in response to a citizen complaint to 911, reporting the suspect vehicle driving in an "erratic and menacing" manner. (4) Deputy Pledge had his lights and siren activated. (5) The pursuit occurred on a four-lane highway. (5) The location of the pursuit was not a densely populated urban area. (6) The weather was clear. (7) The road was dry. (8) The visibility was good. (9) The duration of the pursuit from the time the suspect vehicle fled the traffic stop to the collision was only 75 seconds. (10) Deputy Pledge entered the intersection on a green light. (11) The police officer's speed at the time of impact was between 70 to 75 miles per hour. (12) Sixteen-year-old Amanda Dayton Nehring made a left turn into the path of the oncoming police car, turning between the suspect vehicle and the police car.

¶ 34    To summarize, Deputy Pledge had his first encounter with the suspect vehicle after a citizen complaint about the nature of the vehicle's driving. This obviates any argument that it was the presence of the police officer that caused the dangerous driving of the suspect vehicle. After the stop, the suspect vehicle fled toward Macomb at a high rate of speed with no lights. Deputy Pledge made a determination that it was better to try to stop that vehicle than it was to let it go. I should not need to list the obvious dangers to the public by a vehicle driving at a high rate of speed at night with no lights. The fact that the collision took place between the plaintiffs' vehicle and the squad car as opposed to the plaintiffs' vehicle and the suspect vehicle is simply a

14

cruel twist of fate. Had the squad car not slowed, or had gone faster, it likely would have been through the intersection before Amanda made the turn.

¶ 35    No reasonable person could conclude that this deputy's decision to try to stop a vehicle that was driving at night at high speeds with no lights constituted willful and wanton behavior. As a matter of law, any error was harmless. Imagine, if you will, a police officer parked by the side of the road when a speeding car passes by at night with no lights. Would any thinking person suggest that the officer should do nothing because adding a police car with lights and siren to the mix would increase the danger?

¶ 36    We had a police officer faced with a driver who was an apparent danger to public safety and the officer decided to intervene. See *Hall v. Village of Bartonville Police Department*, 298 Ill. App. 3d 569, 572 (1998). In fact in *Hall*, this court explained that in addition to the truck driver's perceived intoxication, it could not ignore a number of important facts, including (1) the officer activated his lights and siren; (2) the chase occurred on a four-lane highway; (3) the location of the chase was not a densely populated urban area; (4) the weather was clear; (5) the road was dry; and (6) the duration of the chase was relatively brief. Based on those facts, this court concluded, like the trial court, that as a matter of law, "the officer did not act in disregard for the safety of others." *Id.* at 573.

¶ 37    In this case, we have a driver who is driving in an erratic and dangerous manner prompting at least one citizen to call the police. Deputy Pledge got behind him, observed more such conduct and made the stop. After stopping, the vehicle then fled, turning off its lights and driving at a high speed. Deputy Pledge determined that the best thing to do was try to stop that vehicle. Tragically, this accident happened when a 16-year-old driver made a left turn into the

15

path of a police car, which was coming into an intersection at a high speed with its lights and siren activated.  To suggest that the officer's conduct in deciding to try to stop the suspect vehicle constituted willful and wanton misconduct or that a jury could find willful and wanton misconduct on these facts flies in the face of common sense and every reported decision.  See, for example, *Urban v. Village of Lincolnshire*, 272 Ill. App. 3d 1087 (1995); *County of Sacramento v. Lewis*, 523 U.S. 833, 854 (1998); *Wade v. City of Chicago*, 364 Ill. App. 3d 773 (2006).

¶ 38    Plaintiffs argue that the deputy violated department guidelines.  Maybe so, but most probably not.  Regardless, this deputy did what any reasonably qualified and conscientious police officer would have done faced with the same situation.  More importantly, a violation of self-imposed rules or internal guidelines does not constitute evidence of wilful and wanton misconduct.  *Wade*, 364 Ill. App. 3d at 781.

¶ 39    Therefore, there is no need to discuss the evidentiary rulings in this case.  Since I would affirm based on the plaintiffs' failure to establish a *prima facie* case of willful and wanton misconduct, I respectfully dissent.