# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

CHANNARY HOR,

        Appellant/
        Cross Respondent,

        v.

THE CITY OF SEATTLE, a Washington
municipal corporation,

        Respondent/
        Cross Appellant,

OMAR TAMMAM,

        Defendant.

No. 70761-2-I

DIVISION ONE

UNPUBLISHED

FILED: August 3, 2015

Cox, J. — Channary Hor appeals the judgment on an adverse jury verdict in this personal injury action. The trial court did not abuse its discretion in either giving its jury instructions or in refusing to give Hor's proposed instructions. Further, the trial court did not abuse its discretion in admitting the expert evidence that she challenges. Finally, the court did not abuse its discretion in denying her mistrial motion based on alleged misconduct of the City's counsel during opening statements. We affirm.

This action arose from a tragic accident on May 17, 2006. Before the accident, Hor was a healthy 16 year old. While riding as a passenger in a car

driven by Omar Tammam, she was rendered quadriplegic. Tammam crashed into a rockery after failing to negotiate a turn at a high rate of speed. Shortly before this crash, Tammam had sped away from a police officer who approached the car where he was seated with Hor in Seward Park.

Because the park was closed at the time, Officer Adam Thorp left his vehicle, approached Tammam's car on foot, and knocked on its window. Rather than speaking with Officer Thorp, Tammam sped away with Hor in the car.

Officer Aaron Grant, who was outside Seward Park in his vehicle, observed Tammam speed past Officer Thorp. Officer Grant turned his car around and followed Tammam's car. Officer Thorp returned to his vehicle and followed the other two cars.

Tammam, after speeding from Seward Park, turned left onto Juneau Street and followed that road uphill to its intersection with Seward Park Avenue South. Tammam then turned left on Seward Park Avenue South and continued on that street until he reached the top of the hill. At the top of the hill, Tammam crashed into a rock wall, severely injuring Hor. Seconds before the crash, the car reached 86 miles per hour.

Hor sued both Tammam and the City of Seattle. She alleged the City and its officers were negligent by engaging in a high speed pursuit of Tammam as he fled.[1] Specifically, she claimed their actions violated the Seattle Police Department's internal pursuit policies. She claimed their negligence was a cause

---

[1] Appellant's Opening Brief at 23-26.

of her damages. The City denied liability, claiming Tammam's negligent driving was the sole cause of Hor's damages.

At trial, the jury rendered a defense verdict as to the City. The court entered judgment on the verdict and denied Hor's motion for a new trial.

Hor appeals. The City cross-appeals.

## JURY INSTRUCTIONS

Hor argues that the court abused its discretion in giving certain jury instructions. We hold that the court did not abuse its discretion in giving its instructions.

This court reviews legal errors in jury instructions de novo.[2] If a jury instruction correctly states the law, we review for abuse of discretion the trial court's decision to give the instruction.[3] We also review for abuse of discretion the trial court's refusal to give an instruction.[4] "Whether to give a particular instruction" is also within the court's discretion.[5] "Jury instructions are generally sufficient if they are supported by the evidence, allow each party to argue its theory of the case, and when read as a whole, properly inform the trier of fact of the applicable law."[6] Whether a jury instruction is appropriate is "governed by the

---

[2] Fergen v. Sestero, 182 Wn.2d. 794, 803, 346 P.3d 708 (2015).

[3] State v. Stacy, 181 Wn. App. 553, 569, 326 P.3d 136, review denied, 335 P.3d 940 (2014).

[4] Id.

[5] Stiley v. Block, 130 Wn.2d 486, 498, 925 P.2d 194 (1996).

[6] Fergen, 182 Wn.2d at 803.

3

facts of the particular case."[7]

*Instruction 17 & Proposed Instruction 27*

Hor argues that the court abused its discretion by giving instruction 17 and declining to give her proposed instruction 27. We disagree.

Instruction 17 deals with emergency vehicles. The instruction, based on WPI 71.01 and RCW 46.61.035, reads:

> A statute provides that:
>
> The driver of an emergency vehicle, when in the pursuit of an actual or suspected violator of the law shall use visual signals, and audible signals when necessary, to warn others of the emergency nature of the situation. The driver of an emergency vehicle may exceed the maximum speed limit so long as life or property is not endangered.
>
> The driver of an emergency vehicle has a duty to drive with due regard for the safety of all persons under the circumstances. The duty to drive with due regard for the safety of all persons means a duty to exercise ordinary care under the circumstances. A driver of an emergency vehicle shall be responsible for the consequences of his disregard for the safety of others.[8]

Hor initially proposed this instruction. But when the court took formal exceptions to its proposed instructions to the jury, she excepted to this one. She asked, instead, that the court substitute her proposed instruction 27 for instruction 17.

Her proposed instruction, based on WPI 71.06, reads:

> At the time of this occurrence, Officer Thorp's and Officer Grant's vehicles did not qualify to be operated as emergency vehicles. Accordingly, the officers['] vehicles were governed by the

---

[7] Id.

[8] Clerk's Papers at 2924.

4

same rules and standards as apply to the operators of motor vehicles generally.[9]

The notes to WPI 71.06 state that "[t]his instruction should be used in those instances in which an emergency type of vehicle is involved, but the court decides as a matter of law that it failed to qualify as such."[10]

The court declined to substitute Hor's proposed instruction 27 for its instruction 17 and gave the latter to the jury.

Hor claims that instruction 17 is unsupported by the evidence, misstates the applicable law, and serves to encourage juror confusion. She is mistaken in all respects.

Instruction 17 is supported by evidence in the record of Hor's theory of the case. Hor presented evidence at trial that the officers were negligent by engaging in a high speed pursuit of Tammam's car with their vehicles when he sped away from Seward Park. And she argued this theory to the jury during closing.

Moreover, this instruction was a correct statement of the law. The jury had been instructed that they could consider the violation of a statute as evidence of negligence. Instruction 17 informed the jury that it was a violation of a statute for the driver of an emergency vehicle to endanger life or property by exceeding the speed limit. It also informed the jury that "[t]he driver of an emergency vehicle has a duty to drive with due regard for the safety of all

---

[9] Clerk's Papers at 2901.

[10] 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 71.06 (6th ed. 2012).

5

persons under the circumstances."[11] Thus, the instruction was appropriate to the facts of the case, as it informed the jury about the scope of the emergency vehicle privilege and the duty that drivers of emergency vehicles owe to others.

We see nothing in either this instruction or the record that supports the assertion there was any jury confusion based on this instruction. And Hor does not explain this bald assertion. Thus, we do not further address this contention.

The court also properly refused to give Hor's proposed instruction 27. It simply does not apply to this case. First, the usage note for the instruction states that it should be given when the court decides as a matter of law that a vehicle is not an emergency vehicle.[12] There was no such ruling here.

Hor argues that the trial court's ruling on a motion in limine was such a conclusion. But she is incorrect. The judge who ruled on the motion in limine was not the trial judge. The court ruled that, due to the City's answers to discovery, it could not claim that the officers' cars were privileged to speed because they were acting as emergency vehicles. This ruling was based on estoppel principles—the officers denied using their lights or sirens, thus the court determined that they could not later claim that they were privileged to speed as emergency vehicles.

But the court did not rule as a matter of law that the officers were not operating their cars as emergency vehicles. Hor testified that the officers pursed Tammam's car with their lights and sirens turned on. They denied doing so.

---

[11] Clerk's Papers at 2924.

[12] 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 71.06 (6th ed. 2012).

6

Thus, there was a question of fact whether the officers were driving emergency vehicles. The fact that the City was estopped from changing its position is not a ruling that the officers were not driving emergency vehicles as a matter of law. Accordingly, giving the proposed instruction would have been incorrect.

Second, giving such an instruction, where the factual issue whether the police vehicles were operating as emergency vehicles was contested, would likely have been a comment on the evidence. This is an additional reason why giving such an instruction would have been erroneous under the facts of this case.

### Instruction 26

Hor next argues that the court abused its discretion by giving instruction 26. Specifically, she claims this instruction misstates the law, is misleading and confusing, is a comment on the evidence, and served to undercut her valid theory of liability. She is again mistaken.

Instruction 26 stated that "Defendant City of Seattle had no duty to control Omar Tammam's acts."[13]

Hor correctly concedes that this statement of the law is "generally true." One does not generally have any duty to control another absent special circumstances. But she argues that under her theory of the case, this instruction was inappropriate. We disagree.

---

[13] Clerk's Papers at 2933.

7

First, she argues that her theory of liability was that the two police officers were "controlling" Tammam's actions by pursuing him at high speed. This theory is without support in any of the cases on which she relies.

Hor cites three cases for the proposition that police officers control the actions of a fleeing driver. First, she cites Suwanski v. Village of Lombard.[14] Hor relies on the following statement by the Appellate Court of Illinois:

> A police pursuit is unique in the sense that it can occur only if two vehicles are involved, the car that is fleeing and the car that is chasing. It is essentially symbiotic; both vehicles are necessary to have a chase. Thus, from the standpoint of causation in fact, it is difficult, if not impossible, under the facts of this case, to separate the two in terms of causation. Of course, a jury may very well conclude that both drivers were the proximate cause of the harm.[15]

This statement does not stand for the proposition that police officers control the actions of a fleeing driver. It merely states that both a police officer and a fleeing driver may jointly be the proximate cause of harm.

Second, Hor cites Mason v. Bitton.[16] But that case merely states that police officers may be concurrently negligent if a pursued vehicle harms a third-party.[17]

Finally, she cites Yong Tao v. Heng Bin Li.[18] But that case is

---

[14] 342 Ill. App. 3d 248, 794 N.E.2d 1016 (2003).

[15] Id. at 255-56.

[16] 85 Wn.2d 321, 534 P.2d 1360 (1975).

[17] Id. at 326-27.

[18] 140 Wn. App. 825, 166 P.3d 1263 (2007).

distinguishable because it is based on an agent/principal relationship.[19] There, the plaintiff was injured after the van he was riding in crashed.[20] The van had been the second vehicle in a three-vehicle caravan.[21] The lead driver instructed the other drivers to follow him and drove "too fast for the road conditions."[22] "According to the lead driver, the second driver was under the lead driver's control and direction on the journey."[23]

Division Three of this court held that those circumstances "support a finding of both control and consent."[24] Thus, whether the lead driver and the second driver had an agency relationship was a question of fact for the jury.[25]

Here, there was no agency relationship between the officers and Tammam. Thus, Hor has failed to establish that the officers controlled Tammam's actions. Consequently, it was appropriate for the court to instruct the jury that the City had no duty to control Tammam.

Hor also argues that this instruction was a comment on the evidence, instructing the jury to disregard Hor's theory of the case. Hor is mistaken.

As we noted, there is no support for the proposition that police officers control the actions of a pursued driver. Moreover, the instruction did not state the

---

[19] Id. at 828.

[20] Id.

[21] Id.

[22] Id. at 829.

[23] Id.

[24] Id. at 831

[25] Id.

City had no effect on Tammam's actions, or that they did not in fact control him. Instead, it stated that the City had no **duty** to control him. Thus, this instruction was not a comment on the evidence.

### Instruction 27

Hor also argues that the court abused its discretion by giving instruction 27. Specifically, she contends this instruction is both factually and legally erroneous. She is wrong.

Instruction 27 stated, "Defendant City of Seattle owed Plaintiff Channary Hor no duty to protect her from Omar Tammam's criminal acts."[26]

This statement of law is correct, and Hor fails to make a persuasive argument that any exception applies in this case. She argues that because the officers had a duty not to negligently enhance the danger she faced, this instruction was inappropriate. But a duty to avoid negligently exacerbating danger is not the same thing as a duty to protect Hor from criminal acts.

### Instructions 23, 24, and 25

Hor argues that the trial court abused its discretion by giving instructions 23, 24, and 25. We disagree.

Under CR 51(f), when excepting to jury instructions, a party "shall state distinctly the matter to which he objects and the grounds of his objection, specifying the number, paragraph or particular part of the instruction to be given or refused and to which objection is made." "This objection allows the trial court

---

[26] Clerk's Papers at 2934.

to remedy error before instructing the jury, avoiding the need for a retrial."[27] If a party fails to except to a jury instruction at trial, the party cannot raise the issue on appeal.[28]

We first note that Hor formally excepted to the court's instructions 17, 19, 26, 27, 29, and the jury verdict form. She did not except to the court's instructions 23, 24, or 25, as CR 51(f) requires.

When the court took exceptions to its instructions, it ruled that Hor could submit additional exceptions in writing. But she did so after the case had gone to the jury with the court's instructions, and the jury had rendered a defense verdict.

Hor did challenge instructions 23, 24, and 25 in a footnote to her motion for a new trial. Thus, she has preserved this issue for review, but only with respect to whether the trial court abused its discretion in denying the motion for new trial. Having failed to except to these instructions prior to the case going to the jury, as CR 51(f) requires, we see no basis for overturning the court's instructions on that basis.

Instruction 23 states that "Omar Tammam was guilty of vehicular assault for the manner in which he drove on [the date of the accident]."[29] Instruction 24 defines vehicular assault as "driv[ing] any vehicle in a reckless manner and

---

[27] Washburn v. City of Federal Way, 178 Wn.2d 732, 746, 310 P.3d 1275 (2013).

[28] Id. at 747.

[29] Clerk's Papers at 2930.

caus[ing] substantial bodily harm to another."[30] And Instruction 25 states that "Omar Tammam's reckless driving was a proximate cause of [Hor's] injuries."[31]

Hor argues that these instructions confused the jury by using the word "reckless," because the jury was instructed to allocate fault between negligent parties. She states: "[N]owhere within the [court's] instructions is there any indication that it had already been determined as a matter of law, (due to the entry of a default order), that Mr. Tammam had been found 'negligent.'"[32]

But this statement is false. The court's second instruction told the jury that "[i]t has already been established, and it should be accepted by you, that Co-Defendant Omar Tammam was negligent and that his negligence was a proximate cause of injury and damage to the plaintiff."[33] Thus, the court's instructions, as a whole, adequately informed the jury that Tammam had been found negligent and that his negligence was a cause of Hor's injuries.

Hor also argues that the instructions overemphasized the City's theory of the case. Not so. The court's instructions as a whole properly instructed the jury on the duties that the officers owed to Hor. Instruction 12 provided the general duty of care that drivers owe to avoid placing others in danger. And instruction 17 stated that "[t]he driver of an emergency vehicle has a duty to drive with due regard for the safety of all persons under the circumstances" and "[a] driver of an

---

[30] Id. at 2931.

[31] Id. at 2932.

[32] Appellant's Opening Brief at 36.

[33] Clerk's Papers at 2909.

12

emergency vehicle shall be responsible for the consequences of his disregard for the safety of others."[34]

Accordingly, the instructions did not overemphasize the City's theory of the case. The trial court did not abuse its discretion in denying the motion for a new trial based on the challenges to these three instructions after verdict.

*Instruction 21*

For the first time on appeal, Hor argues that the trial court abused its discretion by giving instruction 21. Because she did not except to this instruction below, she cannot do so for the first time on appeal.

As just discussed, Hor formally excepted to the court's instructions 17, 19, 26, 27, 29, and the jury verdict form. At the taking of exceptions, the court permitted Hor to later submit additional exceptions in writing. In her reply brief on appeal, she identifies her motion for a new trial as the document in which she excepted to instructions 21, 23, 24, and 25. But while Hor objected to instructions 23, 24, and 25 in a footnote, her motion for a new trial is silent on instruction 21. Accordingly, we deem any challenge to this instruction to have been abandoned.

At oral argument of this case, Hor argued that she preserved for appeal exceptions to the court's instructions by challenging them prior to the court taking formal exceptions. That argument is not well-taken.

First, as CR 51(f) makes clear, the point of formal exceptions is to alert the court of any and all challenges to the court's instructions so that alleged errors

---

[34] Id. at 2924.

may be either corrected or preserved for appeal. That is our proper focus for purposes of review, not informal discussions between the court and counsel.

Second, in this case, a review of the record does not clearly show what material was before the court and counsel during discussions prior to the taking of formal exceptions. Thus, there was no preservation for appeal of issues then discussed.

*Proposed Instruction 18*

Hor also assigns error to the court's failure to give her proposed instruction 18. Because she neither excepted to this failure below nor argues this matter in her opening brief, we do not reach this issue.

As we previously discussed, CR 51 requires a party to timely except to the failure to give a proposed instruction. This record fails to show that Hor did so below.

Further, "A party that offers no argument in its opening brief on a claimed assignment of error waives the assignment."[35] Hor's opening brief contains no argument on this assignment of error.

For both of these reasons, we deem this claim of error abandoned.

*Verdict Form*

Hor argues that the court abused its discretion by omitting the names of the individual officers from the verdict form. It is uncontested that the form retained the name of the City of Seattle. She characterizes this omission as a

---

[35] Brown v. Vail, 169 Wn.2d 318, 336 n.11, 237 P.3d 263 (2010).

14

"de facto dismissal" of the officers as defendants in this action. This characterization is inaccurate and the claim has no merit.

This court reviews special verdict forms under the same standard as jury instructions.[36] "Essentially, when read as a whole and with the general charge, the special verdict must adequately present the contested issues to the jury in an unclouded, fair manner."[37]

We first note that Hor fails in her burden to show prejudice by the omission of the names of the individual officers from the verdict form. That is because the only reason she advances for including their names is for the purpose of apportioning liability. But the jury verdict rendered apportionment of liability among the City defendants moot because the jury determined there was no liability of the City. Because it was uncontested that the officers were acting within the scope of their employment, the City was the ultimate source of Hor's claim for damages. Absent liability, there simply was no claim for damages.

Even if Hor could overcome this barrier and show prejudice, her characterization of the omission of the individual officers' names from the special verdict form as a "de facto dismissal" is simply a mischaracterization of the record. The record reveals that Hor agreed to omit the names of the officers from the caption of the case, provided they remained as defendants. We find nothing in the record to evidence that they were ever dismissed as defendants to this case.

---

[36] Capers v. Bon Marche, 91 Wn. App. 138, 142, 955 P.2d 822 (1998).

[37] Id.

Next, when read with the jury instructions, the special verdict form fairly and adequately presented the issues to the jury. Instruction 3 informed the jury that "[a] City can act only through its employees. The knowledge gained and the acts and omissions of city employees while acting within the scope of their authority are deemed to be the knowledge, acts and omissions of the City."[38]

Additionally, instruction 4 informed the jury that "[t]he law treats all parties equally whether they are government entities or individuals. This means that government entities and individuals are to be treated in the same fair and unprejudiced manner."[39]

Thus, the jury was informed that the City could only be negligent through the acts and omissions of its officers. In this case, there were no allegations that the officers were acting outside the scope of their employment. Thus, the jury could not find that the officers were negligent but the City was not. Additionally, the jury was instructed to treat the City as it would an individual. Accordingly, the special verdict form adequately presented the issue to the jury. There was no error.

## EXPERT WITNESS TESTIMONY

Hor argues that the trial court abused its discretion by permitting speculative expert testimony. We disagree.

"Under ER 702, the court may permit 'a witness qualified as an expert' to provide an opinion regarding 'scientific, technical, or other specialized

---

[38] Clerk's Papers at 2910.

[39] Id. at 2911.

16

knowledge' if such testimony 'will assist the trier of fact.'"[40] Admissibility under this rule involves a two-part analysis: "'(1) does the witness qualify as an expert; and (2) would the witness's testimony be helpful to the trier of fact.'"[41]

Expert testimony requires adequate foundation:

> Before allowing an expert to render an opinion, the trial court must find that there is an adequate foundation so that an opinion is not mere speculation, conjecture, or misleading. It is the proper function of the trial court to scrutinize the expert's underlying information and determine whether it is sufficient to form an opinion on the relevant issue.[42]

We review a trial court's decision on expert witness testimony for abuse of discretion.[43] This court will overturn the trial court's rulings only if its decision was manifestly unreasonable, based on untenable grounds, or based on untenable reasons.[44] A decision is manifestly unreasonable if "it falls 'outside the range of acceptable choices, given the facts and the applicable legal standard.'"[45]

*Accident Reconstruction Testimony*

Hor argues that the court abused its discretion by admitting the testimony of the City's two accident reconstruction experts. Specifically, Hor argues that

---

[40] State v. Yates, 161 Wn.2d 714, 762, 168 P.3d 359 (2007) (quoting ER 702).

[41] State v. McPherson, 111 Wn. App. 747, 761, 46 P.3d 284 (2002) (quoting State v. Guilliot, 106 Wn. App. 355, 363, 22 P.3d 1266 (2001)).

[42] Johnston-Forbes v. Matsunaga, 181 Wn.2d 346, 357, 333 P.3d 388 (2014).

[43] Id. at 352.

[44] State v. Dye, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013).

[45] Id. (quoting In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997)).

the experts' testimony lacked adequate foundation and was essentially speculation. We disagree.

Here, adequate foundation supported the expert testimony on accident reconstruction. Hor does not challenge the expert witnesses' qualifications, only whether their testimony is "speculation."

The City first presented the testimony of Nathan Rose. Rose testified that he reconstructed the accident to determine the distance between the Cadillac Tammam was driving and the patrol cars during the period before the accident. He and his partner measured the roads where the alleged pursuit happened. They also performed detailed tests on the car models involved, including their acceleration capabilities. Rose stated that he also used data recovered from the Cadillac's "black box" to determine how fast the Cadillac was going in the five seconds before impact.

Using this data, Rose and his partner created a computer model of the scene and the vehicles involved. Rose then used this model to evaluate the witnesses' different versions of events. Specifically, he varied the speed that the cars were going to determine how it affected the separation distance. Based on these simulations, he concluded that "the officers' description is physically possible and reasonable. Ms. Hor's is not."

The City also presented the testimony of William Neale, Rose's partner. Neale's role in the accident reconstruction involved visualization—"anything that deals with visibility, lighting, computer animations, computer graphics and alike." Neale testified that he studied the scene of the accident, taking "a lot of data

18

points[,] photographs, video and a survey of the area." He also compared the scene to photographs from the time of the accident to make sure there were no significant differences. Based on this data, Neale calculated the lines of sight on the roadway.

Neale then used Rose's simulations to determine the separation between the vehicles during the alleged pursuit. With this data, Neale determined the vehicles' lines of sight. According to Neale, Tammam would not have been able to see the officers after he turned from Juneau Street to Seward Park Avenue South.

Neale also testified that he conducted acoustic tests to determine whether Tammam would have been able to hear the officers' sirens. He measured the decibel level of the sirens from various locations. He took the decibel readings in a variety of ways, including while being inside a car with the windows rolled up and with the windows rolled down. Neale also calculated the amount of noise Tammam's car likely made, taking readings from a similar car. Neale took decibel readings while driving the car at a variety of speeds. Using this information, Neale testified that Tammam would not have been able to hear the officers' sirens for 15 to 18 seconds before the crash.

In sum, both Rose and Neal gave detailed descriptions of the data that they relied on. They also described the methods by which they gathered that data. Accordingly, it was not an abuse of discretion for the trial court to rule that adequate foundation supported their testimony and it was not speculation.

Hor argues that Rose failed "to take into consideration the random variables of speed, the driver's experience and skill, etc." But Rose testified that given the speed of the Cadillac before impact, the location of the alleged pursuit, and the physical capabilities of the cars, it was "physically impossible for the officers to keep up with the Cadillac." Because Rose testified that it was physically impossible, he was testifying that it was impossible under any set of variables. Thus, his testimony was not dependent on variables such as driving skill and experience. Accordingly, the fact that Rose did not account for certain variables is not material.

Hor argues that Rose's simulation "was primarily, if not exclusively, based on the false premise that if a car is capable of driving faster than another car, it will do so." Hor argues that Rose assumed that Tammam drove faster than the police cars merely because the Cadillac was capable of doing so. This is an inaccurate characterization of Rose's testimony. Rose testified that the Cadillac's "black box" revealed that it was going 86 miles per hour five seconds before the crash. Based on this data, he "assum[ed] that [Tammam] is going as much throttle that he needs to, in order to reach that 86 miles per hour, five seconds prior to the impact." Thus, Rose's testimony was not improperly speculative.

Hor also argues that Neale's line of sight evidence resembles a line of sight video that was excluded in an out-of-state case. In Lorenz v. Pledge, the Illinois Court of Appeals ruled that a line of sight video was inadmissible because the party failed to "demonstrate that the essential conditions of the line-of-sight

20

evidence offered by their expert were substantially similar to the conditions" at the time of the accident.[46] But that case is distinguishable.

In Lorenz:

> [T]he pursuit involved speeds in excess of 100 miles per hour, while the SUV and squad car in the video were driving at 40 miles per hour. The vehicles in the experiment were in a different lane than the SUV and [the defendant's] vehicle, and standing traffic is visible in the video that was not present when the accident occurred. The SUV's lights were on in the video, contrary to the pursued SUV, which had turned off its lights during the pursuit. The video was taken from a static position in the left-turn lane, while the evidence at trial suggests [the plaintiff's] minivan was consistently moving through the intersection.[47]

Thus, in Lorenz, the video was significantly different from the events that transpired.

In contrast, here, Neale's testimony establishes that he reasonably replicated the conditions of the accident. Thus, there was a showing that the conditions were substantially similar to the conditions at the time of the accident.

Hor argues that the software Rose used for his simulations, PC-CRASH, is unreliable, making his testimony "inherently speculative." Hor relies on State v. Sipin for this argument.[48] That reliance is misplaced.

In that case, the State used a version of the PC-CRASH software to try to prove that Michael Sipin had been driving a car.[49] Sipin and his friend were both

---

[46] 2014 IL App (3d) No. 130137, ¶ 21, 12 N.E.3d 550, appeal denied, 21 N.E.3d 714 (2014).

[47] Id. at ¶ 20.

[48] 130 Wn. App. 403, 123 P.3d 862 (2005).

[49] Id. at 405-06.

inside a car when it crashed and were both ejected from the car.[50] The State

attempted to use PC-CRASH to demonstrate that based on the physical

evidence, Sipin had been in the driver's seat at the time of the collision.[51]

Sipin challenged this evidence under the test announced in Frye v. United

States[52] for the admissibility of novel scientific evidence.[53] At the Frye hearing,

the State's expert witness relied on two studies validating PC-CRASH.[54] One

study "showed a comparison between staged collisions of vehicles that

measured tire marks, speed, and direction, and PC–CRASH simulations, and

found that the computer simulations predicted speeds in car crashes that were in

agreement with 'real world' results."[55] The other study was a validation of PC-

CRASH's model of collisions between vehicles and pedestrians.[56]

But no validation studies supported the specific use of PC-CRASH

involved in that case—simulating the movement of bodies within a vehicle.[57] The

expert admitted that "no studies currently existed that validated PC–CRASH for

use in simulating the interaction between a person and the interior surfaces of a

---

[50] Id. at 407.

[51] Id. at 408.

[52] 293 F. 1013 (D.C. Cir. 1923).

[53] Sipin, 130 Wn. App. at 408.

[54] Id. at 408-09.

[55] Id. at 409.

[56] Id. at 410.

[57] Id.

vehicle during an accident."[58] The trial court allowed the expert to testify over Sipin's objection.

After the jury convicted Sipin, he moved for a new trial. Sipin submitted three studies that arguably undermined the validity of using PC-CRASH to simulate the movement of occupants within vehicles.[59] He also submitted an assessment of the State's PC-CRASH simulation from PC-CRASH's North American distributor.[60] The distributor stated that the "program had not been validated for use in modeling the interaction of occupants within the vehicle interior, and that [the State's] use represented 'an overextension of the capabilities of the model.'"[61]

On appeal, after conducting additional, independent review of scientific materials, this court held that the State's use of PC-CRASH had not been accepted by the scientific community.[62] The Sipin court carefully limited its holding to that expert's specific use of PC-CRASH.[63] It noted that in State v. Phillips,[64] Division Two of this court had held that PC-CRASH is generally accepted by the scientific community.[65] But the Sipin court noted that in Phillips

---

[58] Id.

[59] Id. at 412.

[60] Id. at 413.

[61] Id.

[62] Id. at 420.

[63] Id. at 421.

[64] 123 Wn. App. 761, 98 P.3d 838 (2004).

[65] Sipin, 130 Wn. App. at 420-21.

23

"the PC–CRASH program was used to predict movement of the vehicle in a single-impact crash, and the relevant scientific community of accident reconstructionists agreed that the computer program was reliable for that purpose."[66]

Hor argues that the present case is analogous to Sipin. She argues that because the Sipin court did not allow PC-CRASH to be used to simulate the movement of multiple bodies within a vehicle, this court should not allow PC-CRASH to be used to simulate the movement of multiple vehicles over a distance. This argument is untenable.

First, in this case, the City's accident reconstruction experts did not use PC-CRASH for an unsupported use, such as simulating the movement of bodies within a car. Instead, they used the program to simulate the movement of vehicles, calculating how far behind the officers' vehicles were from Tammam's car. Hor fails to cite anything indicating that this is not an accepted use of PC-CRASH.

Second, in Sipin, the court was presented with evidence that the State's use of PC-CRASH was not accepted in the scientific community. Here, Hor has failed to present any evidence showing that it is not accepted in the scientific community that PC-CRASH can be used to simulate the relative positions of multiple vehicles. Rose testified that PC-CRASH is "widely used in the industry" and has been "heavily tested, [and] published about." Hor does not controvert this with any evidence.

---

[66] Id. at 421.

*Economic Expert Testimony*

Hor also argues that the testimony of the City's economic expert was "false and misleading." Specifically, she argues that the expert used a discount rate that was contrary to industry standards. This claim is without merit.

We note again that Hor raises an issue without meeting her burden on appeal to show prejudice. Specifically, this claim attacks a basis for the determination of damages. The jury assessed damages solely against Tammam, not the City. Accordingly, the challenged testimony may adversely affect Hor's claims against Tammam. But there simply is no showing it has anything to do with the City.

In any event, there is no merit to this claim. At trial, the City's expert witness William Partin stated that 5.98 percent was an appropriate discount rate to apply to the award of damages. Partin testified that the appropriate discount rate in this case was based on the use of a "blended portfolio." That would mean investing one third of the award in "short-term treasury bills, a third in the AAA rated bond fund . . . and one third in an S&P 500 Index fund." Partin testified that the discount rate that this method produced was in the middle of the range of discount rates that economists use.

Hor objected to the use of this blended portfolio method, arguing that it was not accepted by economists. The trial court and counsel questioned Partin on his methodology outside the presence of the jury. Partin testified that other economists use the same methodology and cited a journal article that supported

his views. The trial court ruled that Hor's objections went to the weight of Partin's testimony rather than to its admissibility.

This was not an abuse of discretion.

Hor relies on Barth v. Rock.[67] But that case is not analogous. In Barth, an expert witness testified that the plaintiff had died from an allergic reaction to sodium pentothal.[68] To support his opinion, the witness cited a study that purportedly showed 55 documented cases of this type of allergic reaction.[69] The witness did not have a copy of the study but gave the name of its author and the textbook in which it was published.[70]

When counsel later obtained a copy of the study, he learned that the 55 cases in the study were not allergic reactions to sodium pentothal, but to "barbiturates in general."[71] Additionally, "[o]ther expert witnesses testified that an allergic reaction to sodium pentothal was an event so rare there are only nine reported cases out of billions of surgeries over a period of 40 years."[72]

This court held that because the witness's testimony misled the jury, and because of "the speculative nature of the theory of allergic reaction to sodium pentothal," the trial court did not abuse its discretion by ordering a new trial.[73]

---

[67] 36 Wn. App. 400, 674 P.2d 1265 (1984).

[68] Id. at 403.

[69] Id. at 403-04.

[70] Id. at 404.

[71] Id.

[72] Id.

[73] Id. at 404-05.

Barth is not analogous to the present case. In Barth, the expert witness gave patently false testimony. Here, Hor's expert economic witness simply disagreed with Partin. Hor submitted a declaration by its economic expert that disagreed with Partin. The declaration stated:

> I have not come across any economist or forensic accountants (other than Mr. Partin in this case) that have used corporate stock returns as a component for discounting future losses for personal injury or wrongful death claims. I have a faint recollection that a few economists (other than Mr. Partin) may have used corporate bond returns in discounting such losses, but that is not my practice.[74]

Thus, this case is not analogous to Barth.

Additionally, in Barth, the expert witness was not able to be effectively cross-examined at the time of his testimony because counsel did not have the book on which the expert relied. In contrast, Hor was able to extensively cross-examine Partin on his discount rate. Further, Hor's own expert witness was able to testify about his disagreement with Partin's methods. Thus, Hor is not entitled to a new trial.

Hor also argues that the court should not have permitted Partin to "provide an opinion regarding [Hor's] future medical care needs."

Partin testified that he had relied on a care plan created by Dr. Craig Lichtblau, who also testified at trial, to determine the medical care that Hor needed. He used this information to calculate the price of the needed services.

Partin testified that experts in his field "gather information by contacting actual care providers to see what kind of care they actually deliver in a market."

---

[74] Clerk's Papers at 2986.

27

He further testified that he contacted four health care providers. Based on the information he received from these agencies, he calculated the cost of providing the services Hor required.

This was not inappropriate opinion testimony. Partin did not provide expert testimony on Hor's medical needs. Instead, he estimated the cost of her anticipated medical needs based on a doctor's care plan.

### Drug Expert

Hor next argues that the court abused its discretion by allowing speculative expert testimony about Tammam's drug usage on the night of the accident. We disagree.

Dr. Andrew Saxon testified that Tammam's toxicology report showed that Tammam tested positive for marijuana and MDMA, also known as "ecstasy," on the night of the accident. Based on the amount of MDMA in Tammam's blood, Saxon testified that "we can say with quite a bit of certainty that he ingested considerably in excess of 100 milligrams [of MDMA]." He also stated that, based on studies, 100 milligrams was "sufficient to produce impairment with respect to perception, cognition, and behavior."

Thus, adequate foundation supported Saxon's testimony that Tammam was impaired.

Hor cites several cases to argue that the City failed to lay proper foundation for the proposition that Tammam was impaired, but none are helpful.

In Bohnsack v. Kirkham, the supreme court held that the fact that a driver "had consumed one or more drinks some hours before the accident" was

28

insufficient to create an issue of contributory negligence when there was undisputed evidence that the driver was "mentally alert and not under the influence of alcohol."[75] Here, there is no undisputed evidence that Tammam was "mentally alert" and not under the influence of drugs.

In Purchase v. Meyer, a restaurant was sued for serving alcohol to an "obviously intoxicated" person.[76] For this cause of action, "'a person's sobriety must be judged by the way she appeared to those around her, not by what a blood alcohol test may subsequently reveal.'"[77] Thus, a blood alcohol content test was not competent evidence that the patron was obviously intoxicated.[78] But the present case does not involve that cause of action, or its requirement that the person appear "obviously intoxicated."

In State v. Lewis, the defendant sought to introduce testimony that the murder victim had methamphetamine in his body, to support his theory of self-defense.[79] Division Two held that it was not an abuse of discretion to exclude this testimony, when the defense's expert witness "had no opinion" on the effect of the drug on the victim's behavior.[80] In contrast, in the present case, Dr. Saxon

---

[75] 72 Wn.2d 183, 192-93, 432 P.2d 554 (1967).

[76] 108 Wn.2d 220, 223, 737 P.2d 661 (1987).

[77] Id. at 226 (quoting Wilson v. Steinbach, 98 Wn.2d 434, 656 P.2d 1030 (1982)).

[78] Id. at 226-27.

[79] 141 Wn. App. 367, 387-88, 166 P.3d 786 (2007).

[80] Id.

was able to testify that the MDMA in Tammam's blood was "sufficient to produce impairment with respect to perception, cognition, and behavior."

Thus, these cases are not analogous to the present case.

## MISCONDUCT

Hor argues that the trial court abused its discretion by denying her mistrial motion based on the City's counsel's alleged misconduct during opening statements. There was no abuse of discretion in denying the motion.

Under CR 59(a)(2), misconduct by the prevailing party can be grounds for a new trial. To obtain a new trial, the misconduct must "materially affect[] the substantial rights of the losing party."[81] Additionally, the losing party must have properly objected to the misconduct.[82] The trial court should grant a new trial only if "'nothing the trial court could have said or done would have remedied the harm [caused by the misconduct].'"[83]

We review a trial court's denial of a motion for a new trial for abuse of discretion.[84]

During opening statements, Hor's counsel stated:

> But there is more than one cause of this crash. The fuel to the fire was the police chasing Mr. Tammam. So we are going to ask you to assess joint responsibility.[85]

---

[81] Teter v. Deck, 174 Wn.2d 207, 222, 274 P.3d 336 (2012).

[82] Kuhn v. Schnall, 155 Wn. App. 560, 576-77, 228 P.3d 828 (2010).

[83] Id. (internal quotation marks omitted) (quoting A.C. ex rel. Cooper v. Bellingham School Dist., 125 Wn. App. 511, 522, 105 P.3d 400 (2004)).

[84] Hickok-Knight v. Wal-Mart Stores, Inc., 170 Wn. App. 279, 324, 284 P.3d 749 (2012), review denied, 176 Wn.2d 1014 (2013).

[85] Report of Proceedings Vol. 4 (June 6, 2013) at 30.

In response, the City's counsel stated:

> There was a mention by Mr. Barcus of sharing responsibility or allocating responsibility between the two of these. In order to allocate responsibility by one percentage point, you have to find and that is what this case is about, 100 percent negligence on the part of the city.[86]

Hor did not object to counsel's statements when made. Days later, she argued in her mistrial motion that she was entitled to relief based on these statements by the City's counsel.

On appeal, she contends the statements of the City's counsel violated the in limine order regarding "joint and several liability" and the City as a "deep pocket" defendant. We disagree.

The in limine order provides, in part, for the exclusion of:

> [E]vidence or argument about City's Insurance/"Deep Pockets"/Joint and Several Liability.[87]

There simply was no mention of either insurance or "deep pockets" in counsel's statement. So counsel did not violate these two terms of the in limine order.

In ruling on the motion, the trial judge made several observations. First, the court observed that counsel's reference to "shared" responsibility was likely invited by opposing counsel's reference to "joint" responsibility. We agree.

Second, the judge observed that it was unlikely that the jury would remember these passing references or know of their legal significance by the time deliberations started. We again agree. In any event, we note that this

---

[86] Id. at 47-48.

[87] Clerk's Papers at 1956.

31

passing reference to "shared" responsibility is hardly the type of statement that "materially affects" the substantial rights of Hor, as CR 59(a)(2) requires. This is particularly true in view of the fact that the court properly instructed the jury with respect to the law before its deliberations. And the jury is presumed to follow the court's instructions.

Finally, the judge offered to add additional instructions to address the point, provided its instructions to the jury were not adequate to address this problem. There is no evidence in this record that Hor pursued this offer.

For these reasons, we conclude that the trial court did not abuse its discretion by denying the mistrial motion. There was no error in this respect.

## CROSS-APPEAL

The City characterizes its cross-appeal as conditional. The City states that we need not address the issues on cross-appeal unless a new trial follows. Because we affirm the judgment, we conclude that it is unnecessary to address the cross-appeal.

We affirm the judgment on the jury verdict and the order denying the motion for a new trial. We decline to address the issues on cross-appeal.

_Cox, J._

WE CONCUR: